UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CR-100-SNLJ-ACL |
| | ) | |
| OMAR M. GRIM, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

## I. Background

Omar M. Grim is charged with knowingly possessing marijuana with the intent to distribute, being a felon in possession of a firearm, and carrying the firearm in connection with the drug trafficking offense. [Doc. 2] He filed a Motion to Suppress Evidence and Statements [Doc. 29] alleging that officers violated his Fourth Amendment rights by either 1) misrepresenting the purpose of a search conducted at Grim's residence on July 17, 2013, where a home invasion occurred the night before, or 2) exceeding the scope of consent that had been granted. Grim contends that "the objects seized as the fruits of that search, and any subsequent admissions should be excluded as the fruit of unlawful search and seizure." [Doc. 29 at 1] The Government filed a response in opposition to Grim's claims. [Doc. 32]

An evidentiary hearing[1] was held [Doc. 37] and following the hearing, both parties submitted memoranda. [Docs. 46, 50] Grim also filed a reply [Doc. 51] to the Government's

---

[1] Document 42 is the transcript ("Tr.") of the suppression hearing.

post-hearing memo.  Later, Grim filed a Motion to Supplement the Record [Doc. 58] with a supporting memorandum [Doc. 59] wherein he requested that the Court consider the implications of pictures contained on an attached supplemental disc, hereinafter "Def's Supp. Ex."  This Court granted Grim's request to supplement the record.  [Doc. 65]

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress Evidence be denied.

## II.  Proposed Findings of Fact

On May 2, 2013, the Defendant, Omar Grim, was contacted by Chris Rataj, a narcotics detective from the Sikeston Department of Public Safety (DPS).  The detective contacted Grim because the Department of Youth Services (DYS) had received reports that Grim was supplying a young mother with heroin.  The young woman's family was concerned about her welfare, as well as the welfare of her baby.  When Detective Rataj and a DYS officer went to Grim's residence, the female was not present.  Detective Rataj observed a clean marijuana pipe near the kitchen sink.  Grim admitted that he smoked marijuana.  Grim also told the detective to "just take [the pipe] out of my house."  Detective Rataj replied "[t]hat's fine" and advised Grim that if he was dealing heroin, then Detective Rataj would be back.  (Tr. 70-71)  Grim denied allegations that he was distributing heroin.  (Tr. 86)

The next day, Detective Rataj received a report from the DYS officer that the young woman and her baby had been located, and they were safe.  The DYS officer also relayed that the young woman admitted that Grim had been supplying her with heroin.  (Tr. 71)

Another couple days passed and Detective Rataj learned that Sikeston DPS had received a report from an upset mother.  The mother reported that her son had a heroin problem and the

mother was concerned because "Omar" had been calling her son about owing money for heroin. *Id.*

Less than three months later, on the evening of July 16, 2013, around 11 p.m., Grim was the victim of a home invasion. He reported the incident to police and the police responded to his residence to conduct an investigation immediately following the incident. (Tr. 6-9) Grim reported that some men had forced the back door of his house open in the laundry room area and when Grim got to the adjacent kitchen area, one of the men "fired a couple of shots at him." (Tr. 8-9) Grim had a security system in his house. (Tr. 11) He provided officers with a copy of the video segment of the home invasion incident from his security system. (Tr. 12-13)

The following morning, Detective Caton of the Sikeston DPS was assigned the follow-up investigation for the home invasion. He contacted Grim by phone to see if Grim would be willing to come to the station to further discuss the incident. Detective Caton told Grim, "[h]ey, the video is kind of hazy. Would you come in and further describe it." Grim agreed to meet with Detective Caton. (Tr. 41) During the interview at the station, the detective indicated he wanted to go back to the residence to look around some more. (Tr. 21-22) Grim agreed that would be okay and chose to get a ride with Detective Caton since the friend who gave him a ride already went to work. (Tr. 22) The interview lasted from 10:20 a.m., until approximately 10:45 a.m. *See*, Gov't. Ex. #1.

Before departing the station, Detective Caton ran into Detective Rataj, who volunteered to go to Grim's residence and assist with the investigation. (Tr. 22-23, 38-39, 58-59) Detective Rataj was interested in a) assisting with solving the shooting incident and b) seeing if he might observe evidence related to drug trafficking in Grim's home. (Tr. 61, 89) Based on his experience, Detective Rataj had a feeling that the motivation for the home invasion may have

been to steal money or drugs. (Tr. 88) If Detective Rataj had not agreed to assist with the investigation, Detective Caton "probably would have found somebody else just because of the scope of the seriousness of the crime." (Tr. 39)

Detective Caton drove Grim to the residence and Detective Rataj drove separately. (Tr. 22-23, 61, 89) Rataj was waiting at the residence when Caton and Grim arrived. (Tr. 24) Grim unlocked the front door of the residence, turned off the alarm system, and led the officers into his residence. (Tr. 24, 61-62) The officers focused their search on the kitchen and laundry room area, because that was the area where shots had been fired. (Tr. 25-26, 62-63)

A strong odor of marijuana was apparent to the officers when they entered the residence. Detective Caton described the odor of green marijuana, which he'd smelled thousands of times, as "quite potent," with the strongest marijuana odor being in the computer room. (Tr. 28) Detective Rataj described the odor as "strong" (Tr. 64), adding that the odor was stronger in the computer room than in the living room, "but pretty well the whole house reeked of marijuana." (Tr. 72) Both officers noticed that the odor was strongest in Grim's computer room. (Tr. 28, 72)

Even though the officers detected a strong odor of marijuana, they focused their attention on the investigation of the home invasion that occurred the night before. They did not confront Grim about the marijuana odor until they completed their work on the home invasion case. (Tr. 29, 64)

Upon their arrival at Grim's residence, all three men went directly to the kitchen and laundry room where the shooting had occurred. (Tr. 42-43, 90) Grim's assailants had entered his residence from the laundry room located toward the back of the house. (Tr. 12-13) From the laundry room is a door with window panes in the top half. (Def's Ex. A, Clip 1, "WVS S105448.9730000…") The laundry room door with window panes leads into the kitchen. From

that doorway facing the kitchen, immediately to the right of the doorway is the stove. *Id*. at Clip 2, ""WVS S110009.3590000." Working counterclockwise around the kitchen, the stove is situated at 6 o'clock, the sink and window are situated at 3 o'clock, the kitchen bar area is situated at 12 o'clock and the refrigerator was situated at 9 o'clock. (Def's Supp. Ex., Images "DSC_4951," "DSC_4958," and "DSC_5001")

When the officers arrived, they walked into the kitchen area with Grim. (Tr. 42, 90) A trash can was situated against the refrigerator on the side facing the laundry room. (Tr. 66) Strike marks for the two bullets that were shot at Grim struck the edge of the refrigerator door (Def.'s Supp. Ex., Image DSC_4951) and the wall to the left and laundry room side of the refrigerator, *Id*. at Image DSC_4963. The bullet first went through a window screen that was leaning against the wall before it actually struck the wall. *Id*. at Images DSC_4958, DSC_4950, and DSC_4963.

Upon their arrival in the kitchen, Detective Rataj was on the trash can side of the refrigerator and Grim was on the other side. (Tr. 66) Grim was with Rataj and Caton when the detectives initially observed what they believed to be plastic that had been used to contain drugs in the kitchen trash can. (Tr. 50-51, 90-91) The lid to the trash can was open and the plastic packaging was in plain view. (Detective Caton at Tr. 49-51, 55-56; Detective Rataj at Tr. 63-64, 90-91) Both detectives saw plastic packaging in the top of the trash can, which raised their suspicions about drug trafficking. (Detective Caton at Tr. 50-52, 53; Detective Rataj at Tr. 65) Although, Detective Caton stated "[i]t appeared to be, but [he] wasn't certain until later." (Tr. 50-51) Detective Rataj stated he shut the lid within a couple seconds of coming around the corner of the fridge. (Tr. 66) He did not want to alert Grim to the fact he'd seen the plastic, because he didn't want Grim to be concerned about the officers' purpose in being at the

residence. (Tr. 64, 91-92) Detective Rataj did not believe that Grim could see him close the lid, because Grim was on the other side of the refrigerator. (Tr. 66)

Detectives Caton and Rataj worked together to locate additional evidence regarding the home invasion, in particular a spent slug that had not been located the night before. (Tr. 26-27, 63-64, 90-91) The detectives moved the refrigerator and discovered that the slug that had struck the wall landed in the condensation tray underneath the back of the fridge. *Id.* The bullet was seized. (Tr. 27, 64) Pictures of the bullet strikes were not taken until after the bullet had been located in the tray behind and underneath the refrigerator. (Tr. 67) Detective Caton then asked if it would be possible to view more of the video footage that had been captured by Grim's security system; Grim agreed and they went to the computer room. (Tr. 27)

Detective Rataj stepped into the computer room while Detective Caton and Grim were reviewing the security system video to see if it contained any additional helpful information. (Tr. 67) In the computer room, Detective Rataj observed "more baggies that appeared to be from distribution or remanufacturing of marijuana. . .," in "a trash can right beside the doorway." *Id.*; *see also* Tr. 92.

When the detectives concluded their follow-up on the home invasion investigation and they were preparing to leave Grim's residence, Detective Rataj asked if Grim would consent to a search for drugs. Detective Rataj explained that he'd been conducting a narcotics investigation concerning Grim, the officers smelled a strong odor of marijuana in the residence, and they observed packaging associated with drug trafficking. (Tr. 29-30, 43-45, 51-52, 69-70, 72-73, 93) Detective Rataj advised Grim:

> [Y]ou have more or less two choices. Either you can be honest and, you know, work
> with me, and we can work this out and permission to search, or with what information
> I have I can apply for a search warrant. . .it's your right either way if you want us to
> get a search warrant or if you want us – or if you'll give us permission. It's totally up

to you.

(Tr. 72)

In regard to the detectives asking Grim for consent to search, Detective Caton recalled the following:

> I believe [Detective Rataj] told [Grim]. . .you may or may not know that I've been working an investigation on you in reference to narcotic involvement, and we can honestly smell the smell of fresh marijuana, and we'd like to talk to you about that. Could you explain that a little further.

(Tr. 29)  Grim was responsive to the request.  *Id*.  The detectives also wanted to search the residence, so Caton explained that "[w]e asked if we could -- due to the fact that we could smell it and we'd like to see if we could find where the source was coming from. . ."  (Tr. 29-30)  Grim appeared to be somewhat hesitant to grant consent and asked why the detectives wanted to search.  (Tr. 52)  Once they reiterated their concerns and suspicions, Grim agreed that it would be okay for his house to be searched and he signed the consent form.  (Tr. 30, 52)  It is relevant to note that this was not the first time Detective Rataj had been to Grim's residence, because less than three months earlier Detective Rataj visited the residence and communicated with Grim about the fact that Grim was suspected of dealing heroin.  (Tr. 71)

Detective Caton believed that Detective Rataj had provided Grim with a copy of the consent form (Tr. 30, 45-46) and that additional officers arrived <u>after</u> the detectives radioed in the fact consent had been granted.  (Tr. 53)  Detective Rataj testified that the consent form was not provided to Grim until Detective Lawson arrived with the form.  (Tr. 79)  It was not very long between the time Grim gave consent and the form was provided to Grim.  (Tr. 79-80)  The inquiry regarding when the consent form arrived was as follows:

> AUSA:       And so was there some period of time that after you asked Mr. Grim for consent to search that it took for the officer to get down there with the form?

|              |                                                                                      |
| ------------ | ------------------------------------------------------------------------------------ |
| Det. Rataj:  | Not very long.  He was - - I think they were already on their way over there.  He was already on his way over there, because we had been there for a few minutes, and I think he was just coming in. |
| AUSA:        | Okay.  Did you know he would have that form with him when he came in? |
| Det. Rataj:  | Most of us carry them in the patrol cars, but I didn't have any. |
| AUSA:        | I guess what I'm asking is did you call him and ask him to bring that form? |
| Det. Rataj:  | No.  I think once he got there I said, Hey, do you have a form? Just bring it to me. |

(Tr. 79-80)  Grim signed the consent to search form at 11:40 a.m., July 17, 2013.  (Tr. 46, 74, 99; Gov. Ex. #3)  This record supports that the formal written consent form was an afterthought. The undersigned finds that Grim verbally consented to the search prior to signing the consent form.

Based on Grim's consent to search his residence and vehicle, Detective Caton went back to the computer room.  (Tr. 30, 46)  Grim and Detective Rataj went outside to Grim's vehicle, which was also searched and nothing was found.  (Tr. 46-47, 75)  While Rataj and Grim were outside, Detective Caton located several packages of marijuana in a filing cabinet drawer.  (Tr. 47)  He went outside to notify Rataj and Grim.  (Tr. 31, 47)  All three men went into the computer room to see what Caton had found.  (Tr. 31, 75)  After seeing the marijuana, Detective Rataj advised Grim of his *Miranda* rights from memory.  (Tr. 76; Detective Caton's testimony was that the *Miranda* warning was given either before, or directly after the marijuana was found, Tr. 34)  Grim made some admissions about the marijuana.  (Tr. 77)  Detective Rataj also asked whether Grim had any guns in the house; Grim replied that he had two guns in the closet in his bedroom.  (Tr. 32, 77-78)

After all the evidence was packaged at Grim's residence, Grim rode with Detective Rataj to the station for another interview.  (Tr. 78-80)  Grim was once again advised of his *Miranda* rights and signed a *Miranda* waiver form at 12:25 p.m., July 17, 2014.  (Tr. 82, Gov. Ex. #4)  Grim made additional admissions regarding the marijuana and firearms.  (Tr. 83, Gov. Ex. #3)  He was arrested after the interview was concluded.  (Tr. 84)

Detective Rataj prepared the incident report regarding the investigation.  (Tr. 36-37, 102)  He was in charge of the investigation after the seizure of the guns and ammunition.  (Tr. 33)

During the suppression hearing, Grim submitted a disc (Def's Ex. A) containing video surveillance made by Grim's security system of activity viewed from his laundry room into the kitchen when the agents searched it on July 17, 2013.  The security system is activated by movement and takes clips of activity based on movement; it is not continuous surveillance.  (Tr. 105-106)  The clips depict the activities of law enforcement officers involved in a search of Grim's kitchen, as well as photographs being taken during the search.  The door that leads from the laundry room into the kitchen was not completely open.  As a result, some of the activity in the kitchen is not visible, because it can only be seen through a crack in the door and some of the activity occurs behind the door.  While the security video confirms the officers conducted a search and took photographs, it is not possible to ascertain with absolute certainty all of what occurred in the kitchen or laundry room during the consent searches.

Following the submission of post-hearing memoranda, Grim submitted a supplemental disc for the Court's consideration.  The disc contains the photographs that were taken at Grim's residence on July 17, 2013 (*i.e.*, photos of the kitchen where the bullet was found, computer room where the marijuana was found, closet where the guns were found, and contents of the kitchen trash can).  In his Memorandum in Support of Motion to Supplement Record, Grim

invites this Court to make conclusions regarding the kitchen trash can lid based on the time stamps reflected on the video clips (Def's Ex. A) created by Grim's security system. [Doc. 59, filed Aug. 25, 2014] Specifically, Grim requests that this Court attribute the time stamp (10:54:48 a.m.) on Clip 1 of Def's Ex. A (Clip 1, "WVS S105448.9730000…"), to the first photograph on the supplemental exhibit, "DSC_4949" (Def's Supp. Ex., Image "DSC_4949"). [Doc. 59 at 2] Clip 1 shows Detective Caton taking photographs of the kitchen from the laundry room. While the first photograph ("DSC_4949) on the supplemental exhibit is a picture of the bullet strike marks on the kitchen wall to the left of the refrigerator, as well as the kitchen trash can with the lid closed. The activity depicted on Grim's security system clips (Def's Ex. A) and the photographs of the interior of Grim's residence (Def's Supp. Ex.), do not lead the Court to conclude that the kitchen trash can lid was closed when the officers arrived.

First, the compilation of video clips provided in Defendant's Exhibit A was created by Grim, personally. (Tr. 105-106) No evidence was presented to support that Grim is an expert in the use of the security system or computers, or that the time stamps on the video clips were in fact based on the correct time. With regard to the accuracy of the time stamps on the video clips, it is true that the first clip from Grim's security system reflects the time was 10:54 a.m., and the file name coincides with that time stamp, "WS **105448**.9730000…" (Def's Ex. A), however, the first photograph on the supplemental disc was created four minutes later at 10:58 am. (Def's Supp. Ex., Image "DSC_4949) The creation time information[2] embedded in the photographs on Grim's supplemental disc reflect that all of the pictures that were taken of the refrigerator, bullet strike marks, and the kitchen trash can with the lid closed were created

---

[2] When the undersigned placed Def's Supp. Ex. into a computer to view the contents, the "date taken" information for the photographs could be viewed by highlighting the file names. The "date taken" information provided both the date and time each photograph was taken.

between 10:58 a.m. and 11:04 a.m. (Def's Supp. Ex., Image "DSC_4949" thru "DSC_4972")

The photographs that were taken of the kitchen trash can lid open were created at 12:08 p.m. and

12:20 p.m. *See* Def's Supp. Ex. at Images "DSC_4999" and "DSC_5011," respectively. No

evidence was presented regarding the accuracy or inaccuracy of the time stamps on either the

photographs or the security system video clips.

Second, although the consent to search form reflects that it was signed at 11:40 a.m.,

Detective Rataj's testimony was that Grim gave consent, but the form was not signed until

Detective Lawson arrived with the form. (Tr. 79) The tenth clip depicts the kitchen trash can in

the corner of the kitchen between the bar and the sink area, which is on the opposite side of the

kitchen from the refrigerator when the lid appears to be lifted off the trash can and then replaced

by Detective Rataj. (Def's Ex. A at Clip 10) The time stamp for the tenth clip is 11:24:33 and it

lasts 54 seconds; the opening of the trash can lid is around the 41 second mark of that clip. *Id*.

Although the exact moment of Grim's verbal consent is not known, the <u>location of the trash can</u>

<u>in the tenth clip</u> (in the corner of the kitchen rather than beside the refrigerator) <u>is consistent with</u>

Grim having given verbal consent prior to the time he signed the consent form.

The compilation of video clips also appears to be self-serving, because some of the

activity that should have been recorded by the security system during the consent searches is

missing. For example, the time stamp for the **twelfth clip** is <u>11:35:53</u> and it is only ten seconds

long wherein the exterior door that leads to the driveway where Grim's car is parked is <u>closed</u>,

and Detective Rataj can be seen in the kitchen area. (Def's Ex. A at Clip 12, "WVS

S113553.5010000") The time stamp for the next video clip, the **thirteenth clip**, is not until

<u>11:46:47</u>, which is <u>more than ten minutes later</u>. *Id*. at Clip 13. "WVS S114647.2240000." The

thirteenth clip shows the exterior door leading to the driveway completely <u>open</u> and Detective

Caton can be observed exiting the residence. If the security system truly activates with motion as represented by Grim during the suppression hearing (Tr. 105), there should be additional clips showing how the exterior door was opened. The record supports that Detective Rataj and Grim should have been observed opening that door to go outside so that Grim's vehicle could be searched. Additionally, Grim should have been seen during some of the activities in the laundry room and kitchen, however, Grim is not visible in any of the clips.

Contrary to Grim's assertion, the record of this case supports that the photographs in Grim's Supplemental Exhibit were taken <u>after</u> Detective Rataj closed the trash can lid. (Tr. 66-67) This is supported by the testimony of both Detectives Caton and Rataj that when they arrived at Grim's residence, the kitchen trash can lid was open and they moved the trash can along with the refrigerator in order to find the bullet that was behind and underneath the fridge. (Tr. 26-27, 63-64, 90-91) According to Detective Rataj, the officers <u>then</u> returned both items against the wall to take pictures. (Tr. 67) The security system video clips do not show the officers moving the refrigerator to locate the bullet that was underneath the refrigerator, which is likely due to the fact that the laundry room door was closed during those activities.

The Court finds that when the detectives first arrived at Grim's residence the morning of July 17, 2013:

1) the kitchen trash can lid was open (Tr. 49-50, 91);

2) when Detective Rataj saw the trash can lid open and plastic packaging in plain view inside the trash can, he closed the lid (Tr. 65-66, 91) so as not to alert Grim that he knew there was suspected drug packaging in the trash can (Tr. 64, 91);

3) the detectives moved the refrigerator and trash can to find the spent bullet that had struck the wall (Tr. 26-27, 63-64, 66); and

4) when the refrigerator and trash can were returned to their original locations to be photographed (Tr. 66-67), the trash can lid was not reopened.

### III.  Conclusions of Law

Through his original suppression motion [Doc. 29] and his Post-Hearing Brief [Doc. 46], Grim has raised three arguments that he believes will lead the Court to suppress the evidence seized and statements made following his consent to allow the officers to search for drug evidence on July 17, 2013.  The first argument is that the officers exceeded the scope of the consent given by looking in the kitchen trash can.  [Doc. 29 at 2, 3; Doc. 46 at 1, 4-5; Doc. 51 at 1; Doc. 59 at 1]  The second argument is that the officers deceived or misled Grim about the true purpose of the continued search at Grim's residence the day after the home invasion occurred. [Doc. 29 at 2, 3]  Finally, Grim argues that his second consent to a search for drugs was involuntary, because it was a result of an alleged threat that Officer Rataj had or would secure a search warrant.  [Doc. 46 at 4-5; Doc. 51 at 2]

The Government opposed all three arguments.  [Docs. 32, 50]

The facts and evidence in the case support that there were two consent searches conducted the morning of July 17, 2013.  Grim initially granted consent so that law enforcement could search for additional evidence regarding the home invasion that happened the prior evening.  The second consent search was conducted for the purpose of locating drug evidence.

### III.A.  The detectives did not deceive Grim regarding the purpose of the initial consent search of his residence for evidence related to the home invasion.

Grim alleges that the detectives who started searching his home the morning of July 17, 2013, were granted consent under the false pretense that the officers were continuing the investigation of the home invasion that occurred the night before.  During the suppression hearing, Grim suggested that Detective Rataj volunteered to assist with the search in the hope he

would "find evidence that would help [his] drug investigation." (Tr. 89) Grim's suppression motion stated, "[l]ike a false claim relating to the possession of a search warrant, deception or misleading the consenting party, renders the consent invalid. *See*, e.g., *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971)." [Doc. 29 at 2, 3]

"The test as to whether an actor has violated the Fourth Amendment rights of the defendant is one of objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 399 (1989). "There is no subjective intent involved." *Scott v. United States*, 436 U.S. 128, 137-39 (1978).

The Supreme Court has held "that the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978). Relying on the principle in *Scott*, the Supreme Court found in a case where an officer made a purchase of an obscene magazine with the intent to retrieve the money as evidence of the purchase was not a Fourth Amendment seizure. *Maryland v. Macon*, 472 U.S. 463 (1985). "Objectively viewed, the transaction was a sale in the ordinary course of business. The sale is not retrospectively transformed into a warrantless seizure by virtue of the officer's subjective intent…" *Id*. at 471.

In this case, it was objectively reasonable for Detective Rataj to assist Detective Caton with the home invasion investigation, even though Detective Rataj hoped he might also observe evidence that would be beneficial to the drug investigation concerning Grim. The record is clear that Detective Rataj focused on the home invasion investigation before exploring whether Grim would consent to a further search of his residence for drug evidence.

In the *Dichiarinte* case cited by Grim, police asked the defendant whether he had any narcotics and the defendant consented to a search of his home. *Dichiarinte*, 445 F.2d at 128.

While conducting the search, police opened and read incriminating documents during the course of the search that led to the defendant being charged with income tax evasion. The court concluded:

> The evidence at the suppression hearings contains repeated references to the Agents' interest in narcotics; and there was no indication that they desired to look for anything other than narcotics themselves. When defendant became aware that the agents were inspecting and seizing his personal papers, he attempted to call off the search. Under these circumstances, defendant's statement that agents could "come over to the house and look" must be taken to mean at most that they might come and conduct only such a search as would be necessary to establish whether he had any narcotics. Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search.

*Dichiarinte*, 445 F.2d at 129. The instant case is distinguishable in that once the officers completed their search for evidence related to the home invasion, they made a separate and additional request for consent to search for evidence related to drugs. They did not engage in a general exploratory search like the officers in the *Dichiarinte* case.

The record of this case supports that the officers did not misrepresent their purpose in returning to Grim's residence for a follow-up search on July 17, 2013. The detectives' intent was to locate additional evidence concerning the home invasion case. They thoroughly searched the kitchen for evidence related to the shooting and found an expended bullet behind and underneath the refrigerator. They took measurements of the location of bullet strikes and photographed the evidence that was found. They also took a look at additional footage of the home invasion incident that was recorded on Grim's security system.

In addition, Grim invited the detectives into his home for the specific purpose of furthering the investigation of the home invasion which occurred in the kitchen and laundry room of his house. Grim conceded in his post-hearing memo that the officers "were lawfully in

Mr. Grim's home pursuant to his consent relating to the investigation of the home invasion of the previous night." [Doc. 46 at 4]  The conduct by the detectives during the initial consent search was kept within the bounds of the actual consent given by Grim.  The initial search conducted by the officers was not a general exploratory search.  The officers did <u>not</u> use Grim's "limited consent [for the follow-up on the home invasion investigation] as a ticket to get inside his home [to] conduct a general search []."  *Dichiarinte*, 445 F.2d at 130.  It was not until the detectives completed the follow-up investigation concerning the home invasion that the officers requested consent to search for evidence related to drug trafficking.

The Court finds that Grim's consent for the initial search was valid.

**III.B.  The detectives did not exceed the scope of the initial consent search, when they observed plastic packaging associated with drug trafficking in plain view in an open kitchen trash can.**

In regard to his next point, Grim argues that although Detectives Caton and Rataj were lawfully in his home on July 17, 2013, Grim's consent related solely "to the investigation of the home invasion of the previous night." [Doc. 46 at 4]  Adding that "[a]ny search or seizure going beyond the scope of that consent upon which any further consent (or search warrant) would be based[,] would be a violation of Grim's" Fourth Amendment rights.  *Id.*  Grim further stated that there is a factual dispute in the case that is of legal significance:

> Mr. Grim alleges that the marijuana wrapping paper was not found "in plain view" while the police were lawfully present conducting their investigation of the home invasion but rather was a search beyond any reasonable interpretation of the scope of that consent involving the lifting of a trash can lid while looking for a bullet behind a refrigerator.

[Doc. 46 at 5, citation omitted]

As previously stated, the undersigned found that when both Detective Caton and Detective Rataj entered Grim's kitchen, the kitchen trash can lid was open and they observed the

discarded plastic packaging in plain view.  As the Government correctly argued, the plastic packaging within the kitchen trash can was in plain view.  [Doc. 50 at 9-10]

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant."  *Coolidge v. New Hampshire*, 403 U.S. 443,465 (1971).  "The plain view doctrine permits law enforcement officers to seize evidence without a warrant when (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself."  *United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997) (interim quotations omitted).

"[T]he 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but inadvertently comes across an incriminating object."  *Horton v. California*, 496 U.S. 128, 135 (1990) (internal citations omitted).  *See also Ker v. State of Cal.*, 374 U.S. 23, 42-43 (1963).  In *Ker*, officers went to the defendant's residence to make a warrantless arrest based on probable cause the defendant was in possession of drugs.  As the officers were identifying themselves to the defendant and the fact they were conducting a narcotics investigation, the defendant's wife emerged from the kitchen and the officer repeated his identification to her and simply walked to the doorway of that adjacent room.  From that location, the officer observed marijuana on a scale on the kitchen counter.   The Supreme Court concluded that "discovery of the brick of marijuana did not constitute a search, since the officer merely saw what was placed before him in full view."  *Id*. at 43.

In this case, the officers had been invited into Grim's home to further the home invasion investigation.  They went straight to the kitchen where just hours earlier shots had been fired at Grim.  Upon entering the kitchen, both officers immediately noticed the discarded plastic

packaging believed to previously contain drugs in the open kitchen trash can. The incriminating nature of the plastic packaging was immediately apparent to both officers and they would have been justified in immediately seizing it, however, they did not do so. Instead, the detectives waited until they completed the follow-up investigation concerning the home invasion and specifically asked for consent to search for drug evidence.

The Court finds that the detectives inadvertently discovered the plastic packaging in plain view in the open kitchen trash can. Therefore, the discovery of the plastic packaging did not exceed the scope of the consent that had been granted.

**III.B.1.      In the event the trash can lid had been closed, looking into the trash can during the follow-up investigation regarding the home invasion would have been reasonable and within the scope of the initial consent.**

Although the undersigned has found that the trash can lid was open when the detectives initially saw it in the kitchen, the detectives' observation of the contents would have been lawful even if they had to open the lid to see inside.

"A search resulting from an individual's general statement of consent is limited by boundaries of reasonableness." *United States v. Alverez*, 235 F.3d 1086, 1088 (8th Cir. 2000), citing *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993). "A suspect may of course delimit as he chooses the scope of the search to which he consents." *Florida v. Jimeno*, 500 U.S. 248, 252 (1991); and, "[t]he scope of [that] search is generally defined by its expressed object." *Id.* at 251 (alteration added). The standard for measuring an individual's consent under the Fourth Amendment is one of ""objective" reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Alverez*, 235 F.3d at 1088 (quoting *Jimeno*, 500 U.S. at 251). *See, e.g.*, *United States v. Ross*, 556 U.S. 798 (1982) (finding that it was not unreasonable for the police to open a container

found in a car which defendant had given police permission to search when the opened container might have reasonably held the object of the search – drugs).  The failure of a suspect to object to the scope of the search, however, may make it "objectively reasonable" for law enforcement officers to conclude that a general consent to search has been expanded.  *See Martel-Martines*, 988 F.2d at 858 (finding that defendant had impliedly consented to expanded scope of search when, after giving police officers a general consent to search his vehicle, the defendant watched the officers make a small hole in a piece of metal under the car and said nothing).

Grim consented to the officers conducting a search of his residence for additional evidence regarding the home invasion.  He watched the officers, without objection, as they moved the trash can, refrigerator, and screens in his kitchen while they were in the process of searching for and discovering additional evidence related to the shooting.  Even if the kitchen trash can lid had been closed and Detective Rataj lifted the lid to view the contents, such conduct would not have been an act that would exceed the scope of Grim's initial consent.  Opening the trash can to view the contents would not have been a greater invasion than searching behind and underneath the refrigerator.  It would not have been unreasonable for the detectives to consider the possibility that expended bullets or cartridges may have fallen into the trash can the previous evening.

### III.C.  Grim's second consent for the detectives to search for evidence of drug trafficking was voluntary and not coerced even though Detective Rataj stated he would apply for a search warrant if Grim did not consent.

Grim also alleges that his consent was invalid since it was only given after Detective Rataj stated "he would simply get a search warrant if consent was refused."  [Doc. 46 at 5]

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government."  *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008).  A defendant's

voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "Consensual searches do not violate the Fourth Amendment 'because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.'" *Id*. at 906 (quoting *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," *Bustamonte*, 412 U.S. at 225, rather than "the product of duress or coercion, express or implied." *Id*. at 227.

It is the government's burden to prove "voluntary consent by a preponderance of the evidence and [the government] must show that on the totality of the circumstances the officer reasonably believed that the search was consensual." *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005) (citations omitted). In determining whether the prosecution has met that burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. *Bustamonte*, 412 U.S. at 226. *See also United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

"The following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and, (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." *Chaidez*, 906 F.2d at 381 (interim citations omitted).

"In examining the environment in which consent was given, courts must also ask whether the person who consented: (1) was detained and questioned for a long or short time; (2) was

threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood silently by while the search occurred." *Id*. (interim citations omitted). The foregoing facts are not to be "applied mechanically, because '[t]he concept of reasonable suspicion, like probable cause, is not 'readily or even usefully, reduced to a neat set of legal rules.'" *Id*., quoting *United States v. Sokolow*, 490 U.S. 4, 7 (1989), quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

As to the relevant characteristics of Grim at time of his consent to the second search for drug evidence, the Court finds:

(1)     Grim was in his early thirties;

(2)     The recorded interviews with both detectives support that Grim had at least average intelligence and education; he'd been working at the Sonic restaurant for seven years. He also had sufficient abilities with a computer to operate a security system and download snippets of video for use by law enforcement;

(3)     Grim did not appear to be under the influence of alcohol or drugs;

(4)     Grim granted consent prior to being given the *Miranda* warning, although he was advised of the right to withhold consent (Gov.Ex. #3); and

(5)     Based on Grim's past criminal history, including a conviction for Rape, Grim had a previous arrest and would have been aware of the protections afforded to suspected criminals by the legal system.

As far as the environment in which Grim found himself when he granted consent for his home to be searched for drugs, the Court finds:

(1)     Grim had not been detained.  Prior to the officers coming to his residence, he had been voluntarily interviewed by Detective Caton at the police department for 25 minutes.  A consent search for evidence related to the home invasion had gone on for less than an hour before the two detectives asked Grim for consent to conduct a further search for drugs since they a) detected a strong odor of marijuana, b) observed plastic packaging associated with drug trafficking, and c) one of the detectives had been involved in a continuing drug investigation concerning Grim.

(2)     Grim was not threatened, physically intimidated, or punished by the police; in fact he was treated with respect and the officers had been working to solve a crime in which Grim was a victim.

(3)     Grim did not rely on any promises or misrepresentations made by the officers.

(4)     At the time of the consent, Grim was not in custody or under arrest.

(5)     The location of the consent was in Grim's residence which was a private place.

(6)     As the search was being conducted, Grim did not object to the search in any manner.

In addition, the detectives told Grim that a warrant would be sought if he did not consent, but it was up to him.  The consent form that was signed at 11:40 a.m., further provided that Grim had been informed of his:

> "CONSTITUTIONAL RIGHT not to have a search made of the premises and property. . .without a search warrant.  Knowing of my lawful right to refuse consent to such a search, I willingly give my permission to the. . .officer(s) to conduct a complete search of" his house and car.

(Gov.Ex. #3)

In assessing the voluntariness of consent, some courts make a decision between "seeking" a search warrant and "obtaining" one.  The Eighth Circuit generally holds that consent

given in response to a threat to *apply* for a search warrant is voluntary. *United States v. Raines*, 536 F.2d 796, 801 (8th Cir. 1976). The threat to obtain a search warrant is "only one factor in the totality of the circumstances." *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992). *See also United States v. Severe*, 29 F.3d 444, 446 (8th Cir. 1994) (consent voluntary when defendant told that if he refused to consent the officers would obtain a search warrant).

Grim asserts that Detective Rataj's "words and actions made it clear to Mr. Grim that in the absence of consent judicial approval of a search would be obtained," which he alleges made Grim's consent involuntary under *Bumper v. North Carolina*, 391 U.S. 543 (1968). [Doc. 51 at 2] The general rule announced in *Bumper* was that when someone consents to a search based on an assertion that officers have a search warrant, that consent cannot validate the search if the search warrant turns out to be invalid. In *Bumper*, the Supreme Court held that consent was not voluntarily given, because the woman who invited the officers into her home did so only after an officer announced that they had a search warrant to search her house. *Id*. at 546. Based on the officer's assertion that he had a search warrant, the woman responded "go ahead" and opened the door. During the *Bumper* suppression hearing, the prosecutor advised that the government was not relying on the search warrant to justify the search, rather the woman's consent. *Id*. The Supreme Court concluded:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id*. at 550. This case is clearly distinguishable from *Bumper* in that Detective Rataj did not claim he had a valid search warrant. Detective Rataj advised Grim that Grim could consent, or Detective Rataj would use all the information he had to apply for a search warrant. That information included the old information from the investigation that began in May 2013, plus the

odor of marijuana that was detected during the initial consent search, and the observation of the plastic packaging in the trash cans. Based on the information Detective Rataj had when he requested consent to search for drugs, in the event consent had not been given there was sufficient probable cause to secure a search warrant. Detective Rataj's explanation of the options available to Grim was not misleading, unjustified, or impermissibly coercive under the Fourth Amendment. *United States v. Raines*, 536 F.2d 796, 801 (8th Cir. 1976). Detective Rataj simply advised Grim of the legal options available at that moment. *See People v. Gurtenstein*, 69 Cal.App.3d 441, 450 (1977).

This Court finds that the officers did not go beyond telling Grim that they would apply for a search warrant if consent was refused. This is well within the parameters of Eighth Circuit holdings concerning the voluntariness of consent. The Court further finds that the evidence easily established a preponderance of the evidence that Grim's second consent regarding the officers' desire to search for drugs was voluntary and that based on "the totality of the circumstances the officer[s] reasonably believed that the search was consensual." *Almendares*, 397 F.3d at 660. The items seized should not be suppressed.

**III.D.  The Defendant's Statements**

The Defendant requests that his "admissions should be excluded as the fruit of unlawful search and seizure." [Doc. 29 at 1] "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984). "[T]he defendant bears the initial burden of establishing the factual nexus between

the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the initial and second consent searches of Grim's residence did not violate Grim's constitutional rights, Grim's admissions were not fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013). Grim did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.

### IV. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress [Doc. 29] be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of September, 2014.